Your Honor, this is the second case in the morning called 209-0007. Breutzer v. Illinois Commerce Commission, Commonwealth Edison, and the Village of Huntley. On behalf of the Avalanche, Mr. Philip McGuire. On behalf of the Avalanche, Mr. James Wedding for the Illinois Commerce Commission. And Mr. David Stahl on behalf of Commonwealth Edison and the Village of Huntley. Counsel. Good morning, Your Honor. It's Phil McGuire for the Kreutzer Parties, Kreutzer Road Parties, the appellants in this case. This case is a little different from many that I'm sure you are faced with. Because it's not simply a question of whether a particular order is supported by evidence or not supported by evidence, enough evidence, etc. We have here a situation in which the Commerce Commission, by the way it handled the closing portions of this case before it, actually violated its own limited statutory jurisdiction. It did it in a number of ways. Counsel, can I just ask one question? Certainly. Is there any dispute among the parties that a new transmission line is necessary for combat? Is that a dispute? At some point, yes. At this juncture, no? At this junction, no. The real crux of the issue, the overarching issue is the placement of the line on the subject property. That's the crux of the current dispute, correct? That is correct. Yes. We had a case which was prepared, argued, tried, decided, all on the assumption which appears in the record as an exhibit to Commonwealth Edison's petition saying we want a strip 50 feet wide. Along the south edge of Kreutzer Road. By the way, you'll notice the similarity. The Kreutzer family, as it appears in the record here, has owned this property for something like 140 years. And the name reflects that ownership. After the case was decided by the administrative law judge, briefs and exceptions were filed. And all of a sudden, instead of being a 50 foot strip, it has grown to 175 feet. You can read the record. The record, I think, is 15 volumes, as I recall. Something very close to that. And there is not a word in the record before the amended order issued on the reply to the briefs and exceptions that measures 175. So somehow the 50 foot right-of-way metamorphosized into a 175 foot right-of-way. And you're saying there was no evidence before the commission to justify that. Absolutely correct. There is evidence for 50 feet because there are exhibits which are attached to not only the original complaint, but the amended complaint repeats them verbatim. So 50 feet where? The 50 foot evidence is where? To the south or some side of this road? The evidence that was mentioned would be to the south side, yes. And the 175 feet is from the center line? That is correct. How much difference is there altogether then? What's the difference between 50 feet to the south and 175 feet from the center? What's the actual difference? The difference, first of all, there is nothing in the record as to the actual width of the right-of-way. But assuming it is in the vicinity of 66 feet, which I think is a standard right-of-way, you take 30 and it could go as many as 145 feet beyond that. But this is the important thing. The fact that you had to ask that question indicates that the commission's decision is totally, fatally flawed. I understand your point. I'm not questioning. I'm just trying to get a picture here. It's not like the right-of-way that Tom, Ed, and the commission have now got a right to seek eminent domain under grew from 50 to 175. Because then we're comparing apples to oranges. Maybe it grew. Conceivably, it could have gotten smaller, I suppose. I just don't know the difference between 50 from one side of the road and 175 from the other. It's going to depend on how wide the road is, like you said, the right-of-way and all that stuff. That is... We don't know. You said the record doesn't disclose it. Because nobody... Okay. It was unnecessary for us to put that into the record when we're working with a complaint that says we want 50 feet starting from the south edge. Well, I don't think they're disputing this basic point you made that there's nothing in the record referring to 175 feet. You made that point. I don't think they're disputing that. I don't hope not. Okay. So respond to what they are saying, which is different. They're not saying, ah, they're saying it doesn't make any difference because the actual space taken will be determined down... I hate to say this down the road. I believe, Your Honor, that that is, again, something which reveals the weakness of their position. We are supposed to come out of this hearing knowing how much they're going to take and where they're going to take it. We can't tell. No. Because with the amendment, everything is up in the air. If we assume that there was 175 feet split on the center line, that would leave, what, 87 1⁄2 feet. What's going to be required to install the line in that area? Is there any difference? Is there a different type of ground? Are there ecological concerns? Is it going to hurt the flowers? Is it going to disturb the bees? This is all up in the air. Their suggestion is that we strike the 175 foot. The mention of 175 feet, we strike that from the commission's order. That's what they've asked us to do, right? Yes, and then what would that leave you with? Can you say, can you, as an appellate court, decide that another figure is more appropriate? Well, they're not asking us to insert a figure. They're asking us to strike the 175 foot reference, period. They're not asking us to insert another figure. So what's your reaction to that? What's your position on that? Then we're even deeper into a morass of not knowing what we have. They keep digging holes. Pardon me. Back to that. Because they get into them and have to figure a way out. Well, their position is that that will be decided in the condemnation. In the lower court, here's the condemnation proceeding. The condemnation proceeding is at least temporarily non-existent because the traverse has been upheld. I believe that I am using the correct terminology on that. I am not involved in that case. Regardless of whether it's on hold, their position is that the question of how much land is going to be taken is properly decided in the lower court in the condemnation proceeding. What's your position in response to that? My response is that they need to have a definitive finding from the commission as to how much they need before they start talking about the condemnation. By definitive, you mean they need to know exactly what land they want to condemn. They cannot come in with an order that gives them authority to condemn 175 feet and then seek some number less than that? I would feel a little more confident in the statement that they can't seek more than that, whether they can exercise it to the full 175. That I'm not 100% sure of. As I understand their position, their first position is that they were going to go to court and they will take nothing more than 175 feet. You're objecting that that's not supported by the record. That's correct. But suppose they didn't have that problem. They went in there with the original number of 50 feet. Their position is they get a wider range than they're actually going to use and the condemnation court narrows that down. Do you agree or disagree with that as to the way this is supposed to work? If your question is do I agree with that as their position, the answer is yes. If your question is do I think that position is correct, the answer is no. And the reason it's no is you say they have to figure out now exactly the dimensions that they're going to take. Yes, they do because with the 175-foot modification, it's something they didn't ask for and I have cited the cases that say that you can't blindside somebody. No, I'm not talking about the specific feet in this case. I'm talking about the way the procedures work between the hearing at the commission and a subsequent hearing in a trial court on condemnation. Is it your position that the way this scheme is supposed to operate is that they have to come out with the exact dimensions of what they're going to take? As close to that as possible, yes. And then what's left to determine then in the condemnation court? Cost. Value? Value. Okay. I mean, that will always be there, of course. And it's not the way the system is not supposed to work that they come up with a range and then the details are worked out in the condemnation court and even further worked out by engineers later. That's correct. So they have to come up with the exact dimensions as near as possible. Does that mean as near as possible? I mean, if you ended up with under 74 feet, I don't think there would be any problem. But, you know, it's a figure that was picked, at least it appears to have been picked from thin air. And you can't, the commission and Commonwealth Edison cannot do that. They have to have something more material, more concrete than a figure. So your point is that the 50 feet was supported by the record or arguably supported by the record? Yes, ma'am. And this amended order comes out and now it's 175 feet, and your point is how did we get from 50 to 175? With no evidence. Thin air. Is it further your position that the order puts the maximum amount of area that defendants can seek in the trial court in a condemnation case? Does that put a top maximum on it? I believe they would have a hard time arguing that they could get more, so yes. So your position is, all right, if 50 is 50, then when we go to the trial court, that's the most they can get? Yes. And if the 175 stands, that's the maximum they can get. But they, of course, could take less, but not 176 or not 52. I believe that accurately summarizes our position. All right. Thank you. I'm sorry. I thought I heard a question starting. Procedurally, this case is also unusual, to use a neutral term, because there was no mention, no evidence, nothing, until not just after the record was closed and brief signed exceptions were filed, because Edison didn't file one. They didn't file anything until the appellate, pardon me, the reply to the brief signed exceptions. Now, I realize that we are dealing with an administrative agency, but I think it is a very, very close analogy to the rules that we normally follow coming up from the circuit court. If I file a brief and make arguments A, B, and C, and the appellee responds to A, B, and C, my reply brief cannot add D, E, and F. Now, if he adds D, E, and F, I can respond to them, but you're going to strike the other parts of my brief if I come up with them for the first time on the reply, and I believe that is a very, very close, if not exact, analogy to the tactic that Commonwealth Edison used here, and I think it was improper, not only is it improper, it didn't even follow the commission rules, because to get new evidence in, you have to go through certain groups and go to the upper levels of the commission, get approval for reopening the case, etc. The alternative argument, if they say they didn't have to do it, then I come right back and say, hey, then there's nothing in the record. I believe they are on the horns of a dilemma on this, the way not only what was done, but the way it was done. All right, counsel, your time just expired, so I'm going to hear from them now. We're going to hear from them now. There's a final comment you want to make, but you're going to have time for a rebuttal. You understand that, right? Yes, thank you, Your Honor. Okay, thank you. Now, have you guys figured out how you're doing up your time at all? Yes, Your Honor. We've split the time down a little. Okay. Well, that seems like an equitable thing to do. Good morning, Your Honors. I'm Jane D. Wagen, Special Assistant Attorney General, on behalf of the Respondent Bill of My Commerce Commission. With me is Mr. David M. Stahl, Eleanor Stahl, Clay Warren, and Kurt Solberg, who will be arguing on behalf of the Respondent Commonwealth Asset Company. I will be taking up the jurisdictional issue, and I will address the merits briefly. Mr. Stahl will be arguing exclusively on issues on the merits of the approval of the Certificate of Public Convenience and Necessity of a New Electric Transmission Line. So you're going to talk about the motion to dismiss the appeal? Well, the motion was denied, but I re-raised the issue in brief, which I can. Right. So, yes, but it is the same issue. But that's a jurisdictional issue, right? Yes. Okay. Yes. In the case before the Court, the Kreutzer's application for a re-hearing was denied and served on December 1, 2008. Although the filing of the appeal with the appellate court was within the 35 days of the service date of denial, the Kreutzer's did not notify the Commission of this appeal until... Where was it filed, the notice of appeal? The appeal was filed here. The notice of appeal was filed first in the appellate court? Yes, exclusively in the appellate court. The Commission did not get a copy of that until almost two months later, although we did get a copy attached to another motion about six weeks after the 35 days. Counsel, to frame it specifically, there's two ostensible authorizations on this issue. One is Section 10-201, excuse me, Section 10-201 of the statute. The other is Supreme Court Rule 335. Yes. So you are saying which controls here and why? My argument here today is that Section 10-201 requires that the Commission receive a notice of the appeal, whether it's the petition for review, whether it's labeled a notice of appeal, whether we get a letter. I don't care. The statute requires the notice to come to the Commission within the 35 days. We're not arguing that the plaintiff's union did not comply with 335 with its filing of the petition for review in the appellate court, but we are arguing that the General Assembly intended under the statute to have the Commission receive a notice of the appeal. I mean, frankly, this case is probably the worst one I've ever seen, where the case was pending in this court for two months. The Commission is the only respondent that actually has to appear. I mean, combat is here, and usually the utility, if they're a respondent, will show up. But the Commission is the only statutorily designated respondent. We have to produce the record, and we didn't have notice that this appeal even had taken place. What about the Supreme Court's holding of the Consumers Gas Company, in which they declared certain provisions of 10-201 as unconstitutional? Does that bear on this issue? Well, in the first place, of course, that's an appellate court decision, the Consumers Gas case. And in the second place, the Consumers Gas case did say those kind of things, but it's inconsistent with the later Supreme Court decisions, such as CERMEC Health Plan and ESG locks, where the Supreme Court has carefully said that there has to be an actual conflict. In Consumers Gas, the court received a Notice of Appeal. Now, there's no question about timing in that case. The people filed an appeal with the Commission, or the Notice of Appeal, two days after they took, from the time they could start, and four days later they filed something labeled a Notice of Appeal. And if you look carefully at the Fifth District opinion, you get through this long thing about, Supreme Court rule says Petition for Review, statute says Notice of Appeal, conflict, and then they get to the end, well, yeah, but the Petition for Review, as the Supreme Court notes indicate, is in the form of a Notice of Appeal. It is not a complaint in Administrative Review with a summons. And my response on that issue is this, is that the Fifth District found a conflict where none is there. Sure, the statute says Notice of Appeal, as it's said since 1913, in one form or another, but that never described the form that had to be used. The Supreme Court has established the form for direct Administrative Review under 335, but there's really no conflict here. It would have been a conflict if the statute had said, here's the form the Notice of Appeal you must use. So it's sort of like you're saying, it's sort of dicta and it's not controlling, because they really didn't properly reach the issue, that seems to be what you're saying in your interpretation. Well, that's the issue they raised when they said that they would throw out the statute entirely, and that is unconstitutional in the only constitutional law. This Court gets direct Administrative Review by law under Article VI, Section 6, and the Supreme Court has continuously said that strict compliance with the controlling statute is necessary. Only if there's an actual inconsistency, an actual conflict between the Supreme Court rule and the statute, will there be that problem where they have to decide whether their procedural rule controls or whether the statute controls. And as I pointed out in brief, this case is the flip side of the CERMEC health case. In CERMEC health, the General Assembly said the appeals of this agency shall go under Administrative Review law to the Appellate Court. The Supreme Court pointed out that they didn't actually set the time period for taking an appeal. Therefore, the Supreme Court determined that the Supreme Court Rule 303 applied, the 30-day rule, and the Court very carefully said we will not imply that there's a conflict between the two. They just said the General Assembly in that case didn't say anything. The Supreme Court rule said something. In this case, we have the opposite. The General Assembly said notify the commission of the appeal within the 35 days, and the Supreme Court Rule 335B doesn't say anything different. It just says at some point you're supposed to serve the petition for review on the commission, the agency, and the respondents. We're not belaboring that. If we were to decide the 335 controls, is there a problem with the jurisdiction? Well, then you're saying that the statute is in some constitutional limitations with the Court's jurisdiction. I personally have a problem with that, but, I mean, that would be consistent with the consumer's guest opinion. But, as I say, my personal opinion of that is that the Court found a conflict. Now, if you look at consumer's guest, they actually found a conflict in Section 10204 of the Act, which had to do with give or any estate, because 204 was written back when we went to the circuit court and said you had to have a hearing to take evidence. And the Court quite properly said appellate courts don't hold evidentiary hearings and held that to be inconsistent with Supreme Court rules of the appellate court. But when you get to the 10201, despite the rather broad language that Court used, in fact, doesn't even support what the Court stated. Can I decide that issue for the moment, if you could? Yes. Can you explain to us the procedural mechanism, as counsel was alluding to earlier, of how the 50-foot turned into 175 feet? How does that happen? Well, in this case, there are exceptions to the proposed order, and I have to point out that, of course, at the Commission, administrative law judges don't decide anything, that the ALJs only propose decisions to the Commission. Only the Commission can issue a binding decision. Is that a question more appropriate for co-counsel? Well, no. Okay. They proposed and wanted to accept the exceptions to the proposed order that this 175-foot turn be added so that there would be no question about, I mean, this case, from the Kreutzer's point of view, their position has been we have a centennial farm, we have these buildings, you can't build within 50 feet of the roadway, therefore take your transmission line and put it somewhere else. The Commission, using its authority under 8503, conditions approval to say, as long as this line is within 175 feet, and we didn't grant them a 175-foot right-of-way, they don't need a 175-foot right-of-way. They probably don't need a 50-foot right-of-way because that's only as an operational matter, but that's so that if the parties, through their negotiations, or ultimately if a condemnation court gets this, that the court will know that as far as the Commission is concerned, as long as they can preserve whatever rights they have to these buildings under centennial homes or whatever else it may be, so this line can go in without further reference to the Commission. I don't know what to specifically answer to that, but I'll hold it for other counsel. Okay. I would point out that the actual application here, unless I just lost my time, the application here, as amended, did not contain a 50-foot limitation. This is reading of the testimony of the operational concerns as if it was a limitation on what was before the Commission. And one final thing, the Commission did not ask this court to strike anything. The Commission asked that this case be remanded back either if the court determines it should have been evidentiary to take evidence on the 175-foot issue or for the Commission to strike it out of the case. Okay. And with that, Your Honors, thank you. All right, please. Morning, Your Honors. May it please the Court, my name is David Stahl. I'd like to just clarify at the outset one thing, and that is I am here today only on behalf of Commonwealth Edison Company, not the village of Huntley, who I believe have not appeared in this appeal. I was going to talk originally about three things, about the statutory standards, 8406. I was going to talk about the administrative notice issue. I was going to talk about the ICC's Rule 208.70 that was allegedly violated here. But because of what happened during the colloquy with Appellant's Counsel, I'd like to turn to some of those issues. And the first one, Mr. Wagening has always clarified, there was no decision by the administrative law judge. That is simply a recommended order that then goes to the Commission after the brief on exceptions and reply brief on exceptions. It is very important to understand that this 50-foot right-of-way has not been transformed into a 175-foot right-of-way. The right-of-way, whatever it was in the original part of the case, has not changed. It was presented as 50 feet. The change that was added to the final order had nothing to do with the right-of-way or the width of the right-of-way, but only the area in which that right-of-way could be located. The recommended order from the administrative law judge... Well, that's a very significant change, isn't it? It's really, I think, a very insignificant change. And it may be no change at all. The reason I say that... But it's maybe. Counsel's point is, why do we go to the Commission in the first place if they don't tell us where the right-of-way should be? And we did. And originally, it was to be along the southern edge of Creutzer Road. That's as specific as it was. And it's 50 feet wide. That's the right-of-way. And the right-of-way will still be 50 feet wide. But now, under the order that appellants are complaining of, the location can be within 175 feet of the south of the center line of Creutzer Road. So we have a wider area within which to place this. Let me just clarify. You said it's 135 feet to the south. It's not 135 from the center line in either direction? I think it's south of the center line. I have the order here. And this is important because this is the only change. It's at the order page 2609 of the record. And it's advanced easterly along Creutzer Road within 175 feet of the center line of the road right-of-way. And I can explain... Well, if it could go 175 feet, it doesn't have to go to the south. It could. I believe that is correct. But doesn't that find out the crux of the problem? Does the commission's order adequately describe the portion of the property specifically that ComEd is authorized to work at? Well, I think in some ways it more specifically describes the area within which ComEd can work than the simple designation along Creutzer Road because certainly the ICC has argued that along does not mean touching or abutting or contiguous to. It simply means parallel to. Does the property owner know by looking at this where the line is going to be? The property owner will certainly know, certainly once the condemnation court reaches this issue. But aren't they entitled to know when that order is issued? Here's... Let me explain the genesis of this. When the briefs on exceptions were first filed in August of 2008, we all learned for the first time that the Creutzers had achieved landmark designation for a portion of the farm, which essentially consisted of the house. That's south of Creutzer Road. In our reply brief on exceptions, that is true. This is when we first indicated that we would like a change in this. We did it to accommodate that historical designation. And let me read to you from the record. This appears at page 2423 of the record. What we said in our reply brief on exceptions was, ComEd could still construct the proposed line on the Creutzer Road route along the south side of Creutzer Road without causing any physical changes to the Creutzer house. Alternatively, ComEd could simply align the house to the south, or align the route to the south of the house if necessary. To make clear, ComEd may parallel Creutzer Road on the south side of the Creutzer farmhouse. ComEd suggests that the Commission specifically allow such an alignment. Attached to the brief is a suggested addition to Appendix 1. Appendix 1 is the legal designation in the order with the words that I just read to you within 175 feet. So yes, it does say within the center line, but it's quite clear that we were intending to do this to go to the south of the farmhouse if during negotiations the Creutzers indicated they would prefer to have it to the rear of the house instead of in the front of the house. So it's subject to further interpretation by someone or the point. It could be subject to further discretion on the part of ComEd. It would be to the point of discretion with ComEd after we had discussions with the Creutzers. The Creutzers are apparently not interested in this 175 feet, and that's why we suggested in our brief that we would be content to have this court, if you find this is a problem somehow, simply order the Commission or remand the Commission with directions to excise that 175 feet. How do you get around the legal argument that under this section, like a municipality seeking to take certain property, that the order must describe with reasonable certainty the portion of the property sought to be condemned? Where do we get into this subject to further negotiations with the homeowners, subject to further proceedings and condemnation? How do you respond to that? Where is the certainty of the portion of the property being taken? This is, first of all, the nature of this kind of project, because once you get on the ground, there are always unforeseen changes that the engineers will have to work around, and there is testimony in the record from the very first part of the case that specifies that. Isn't that why you get a 50-foot wide strip? Well, that's why we get a 55 right away, but I think Justice Hulson is asking about a different question. Where is the location of it? Is that described with reasonable particularity? I think to say within 175 feet of the center line of Kreutzer Road is more than reasonable particularity on a line that's over 11 1⁄2 miles long and that traverses a significant portion of the countryside. I think that's about as particular as you're going to get, especially when at the end of the day you're only going to wind up with 50 feet. And part of what was in the record is, yes, and I was looking for the exact quotation. Well, it's actually at the record 1579. ComEd's first witness in the case said, We're proposing to acquire the necessary 50-foot right-of-way for our transmission line adjacent to the south edge of the current road right-of-way. If the plans for the road development become more certain, because there were apparently discussions about widening Kreutzer Road, if those become more certain before the line must be built, we may be able to negotiate a solution with the communities and landowners to shift our alignment. Now, that was in a particular context of widening Kreutzer Road, but the principle applies to all alignment issues, that if there is a problem with a particular landowner that we need to discuss, we will discuss it, we will negotiate it. And that's why, as I say, this is why we propose this 175. Final question, what happens if your negotiations with the homeowners break down? What we could do, what we could do and probably would do, would be go back to the original designation, which is along the southern edge of Kreutzer Road. And that's why we say, if this is a problem, you can just remand the commission to excise that designation. We've cited cases under which you clearly have that authority. Kreutzers apparently do not disagree that you have that authority because they didn't argue the point in any of their briefs. Let me get a bigger picture look at the way this is supposed to work. The condemnation court, of course, will set the value, but do they also, what else do they, does the condemnation court actually designate with more particularity what land is actually condemned? I think at the end of the day they will designate that, yes. And the way the scheme is supposed to work is the commission is supposed to authorize comment the outer perimeters then, the maximum amount of land? Yes, the general location that you can then go to the condemnation court and ask the condemnation court to actually condemn this particular right of way within that general perimeter. Is there anywhere in the record that explains how wide the actual transmission line is? Well, I think other than what I just read to you in which the comment witness said, we're proposing to acquire the necessary 50-foot right of way. Well, the 50-foot right of way is, but then why does... How wide is the transmission towers themselves? Is that in the record? I don't think it is. I don't know. It must be less than 50 feet, obviously. But I can't tell you it's in the record. I would guess it's 12 feet. It's just a guess. So the way the game is supposed to work is that originally you have 50 foot, you're authorized, the trial court is then authorized to condemn up to 50 feet. And they'll condemn whatever, and that could be, they get the particulars in the trial court. That's right. It could be along the south edge of Croitzer Road. It could be within 175 feet of the center line. My earlier question, do we know how much difference there is in the amount of taking here? I mean, 175 feet from the center line, I don't know how different that is from 50 feet from the south line. Well, you know, the length of a highway, and this is a four-lane highway, what is the length of a highway? It must be 10 feet at least. The 175 feet was designed to avoid the house. No, no, I understand that. I understand that. You guys, I mean, you have these great intentions for the 175 feet to cooperate with them. They apparently don't like that. But their point is that nowhere in the record is there, as he pointed out, is there ever a mention of 170, nowhere in the evidence is there a mention of 175 feet. Well, that is correct. And I don't, in fairness, I don't think there's anything in the record that would tell you what the difference is in the dimensions between 50 feet along the southern edge of Croitzer Road and 175 feet from the center line. But as it stands now, earlier you said it was going to be 175 feet from the south, but you read the order. From the center line. From the center line, so actually this gives the authority to go even to the north. Well, technically that is correct. And so why isn't the order just completely beyond any evidence at all? It would allow a hundred, it would allow land in the north to be taken. The reason it's not beyond any evidence, and, you know, we heard Mr. McGuire talk about the effect on the bees and on the flowers and more to the point, the least-caused status of the line. But here's the thing. This proposal was made in August of 2008, the 175 feet of the center line. The order itself didn't come out for another two months. Now, appellants have complained that the commission violated Rule 200.870 by not holding additional hearings on the effect of this change. The fact of the matter is the commission was not obligated to. You look at the rule that says the commission may, upon motion of any party, hold hearings at its discretion. I submit that if the Kreutzer's really and honestly believed that there was going to be some big environmental effect or any environmental effect or any cost impact resulting from moving this line from south of Kreutzer Road to within 175 feet of the center line of Kreutzer Road, they would have and should have filed a motion for hearings under 200.870 specifying at least some basis for the commission to believe or suspect or think that there might be some problem with this move from 175 feet or move to 175 feet. But to stand up here and simply say there might be an effect on the bees, there might be an effect on the flowers, or is it... Well, there might be an effect on somebody who owns land in the north of the road. That's the point, yes. Maybe there's a building over there and maybe the cost is going to skyrocket. Yeah. And your position is the record doesn't disclose any of that, but it was their obligation to point out particular problems with that. I am suggesting that if they thought there were environmental problems that were sufficient to make this order not meet the statutory standards of need and engineering feasibility and least cost and economics, at least they would have had the obligation to point out to the commission some evidence, some kind of evidence that would lead the commission to say, maybe we really ought to rethink this, maybe we better make a record on this, because there is no record on this. But when we start out the beginning of the procedure, who goes first before the commission establishes... Well, comment files its application. So why wouldn't your argument be that when you guys step up before the commission, you should just sit on your hands and let them point out where the problems are? Well... Even from the beginning. Why does it change when there's been an addition? Because we have to prevent all of the signings studied, because the statute does it. We have the burden of proof. I am not suggesting for a minute that ComEd does not have the burden of proof. It does have the burden of proof. The commission made all of the findings necessary under 8406, even with the 175-foot addition. It's about all of the standards. It's leased cost, it's necessary, ComEd can do it. Well, let me get this straight. I thought there's no evidence of what's on the north side of the road. So now they can go to the north side of the road up to a width of 170... They can go 175 feet north of the center line. Yeah. And there's no evidence before the commission about anything that exists over there, whether it's environmental or whether it's a farmhouse way in Lincolnstown. There is evidence of what is on the north side. There's a housing development there, and a portion of the Kreutzer farm is on the north. So this is 6,400 feet of Kreutzer Road that we're talking about, and we know it's on the north side. And certainly the intention was... But when they figured out the cost of acquiring the land, it was to acquire 50 feet south of the shoulder. Now, I'm misunderstanding you there. You tell me there is adequate evidence to go 175 feet to the north and know what the cost of acquiring that land is and whether or not that becomes the leased cost alternative? Yeah, but ComEd is not going to do anything here that is going to jeopardize the leased cost status of this, simply to go across the street. The whole purpose is to go to the south to avoid the Kreutzers. That's why this happened in the first place. There is absolutely to avoid the Kreutzer house. There is no reason why ComEd would go to the north. But ComEd could go to the north. But they could. Correct? I suppose they could go to the condemnation court and say, we want to go to the north. But the point is then, why not let the order stand 50 feet as it was originally decided? I'm perfectly content to have you do that. No good deed goes unpunished, and this is another example of that. We should have let the order alone, and we wouldn't even be here today. And if you want to remand this back to the Commission, I say I have no problem with it. I really have two problems with it. First of all, it's not necessary. And I think it ties the Commission and utilities to an unrealistic standard of reasonable particularity in a case like this. But secondly, it's going to impose additional delays on a project that originally was scheduled for 2010. We probably won't even meet 2011 now. And I know that's not your problem. That's our problem. But that is one of the realities that we're dealing with here. So that's the problem I have with sending this back to the Commission to get yet another order that may be subject to yet another repeal. If that's necessary, that's necessary. We are very sorry we made this accommodation in the first place. But in any event, that's where we are. Have there been overloads? I beg your pardon? There was evidence presented that this area would be experiencing overloads as early as 2009. Does that happen? It is not happening because, obviously, growth will slow. But we've had a different economic environment from the one this was originally planned. But we have a certain planning criteria which requires that, in this case, 30,000 customers, and this is in the record, that if you have more than 30,000 customers in an area that are served by only one set of facilities, you really need to add another set of facilities to provide the necessary, what we call, redundancy of service. So if one line goes out, the line can be picked up by another line. And that's what this whole Northwest Reliability Project is all about. Is a customer a household? A household. It could be any kind of customer. But primarily we think of residential. This area was residential growth. That was the whole thing. Yes, primarily residential growth. Then the reality is many industrial customers have their own backup generation. But, of course, we're talking about transmission here. But it's primarily a residential customer concern. Yes. All right. Well, Council, thank you very much for your argument. You call us this afternoon if this 90-degree weather causes a problem. Council, Mr. McGuire. I notice the air conditioning in here is not exactly cranked up. We're going green. We suffer here. First, a comment on Mr. Reagan's argument. Because my time is limited, I don't think I will do more than refer you to the briefs. The issue was briefed originally in the motion. It's also briefed in his brief and my reply. And I think that's adequate. Turning to the real gist of this case, you know, I will admit I talked about the flowers and the bees. Perhaps I should have found a nest, because then you could always say that you said I'm the only case coming out of the ICC that involved the birds and the bees. I was impressed by Mr. Stell's arguments, which are basically that, oh, well, we had good intentions. We think we can do this. We want to do that. We have all of them. We're here to help the Kreutzers. You know, all of those things. I think he practically made my case for me because he allowed himself to be exposed to the questions that all of you have. He said, what does this order mean? And when the commission takes order that is not based on evidence, it's not raised timely or properly, I don't believe the commission even had jurisdiction to say some of the things that it did. And I discussed that at length. I am not going to repeat it. I refer you to my briefs on it, and I think I have covered it. I do want to make one comment, which is that there were a couple of issues, such as the designation of the house as historical farm and historical, et cetera, that are in the brief, but I didn't get around to. And I would ask that you not consider them waived. It was simply because I did not get the time. And if I can have about 30 seconds to go over my notes. Again, just to point out that given the. The nature of what Commonwealth Edison is entitled to take under the order, you cannot determine. What is the least cost? Because the addition or the change to 175 feet basically shot that so many holes in it that nobody can tell from the record. No evidence. And with that, I would thank you. Your honor, I appreciate the opportunity. All right, well, thank you, Mr. McGuire. Thank you both sides for their arguments. And that will be taken under advisement. Decision will issue in due course. In a brief recess.